**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No. 16-CV-002315-RBJ-KMT

THE GEO GROUP, INC., a corporation,
BI INCORPORATED, a corporation,

Plaintiffs,

v.

MATTHEW J. SWANDO, an individual,
NUMEREX CORP., a corporation,

Defendants.

---

**PLAINTIFFS THE GEO GROUP, INC. AND BI INCORPORATED'S FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

---

Plaintiffs The GEO Group, Inc. ("GEO Group") and BI Incorporated ("BI") bring this First Amended Complaint against Defendants Matthew J. Swando ("Swando") and Numerex Corp. ("Numerex").

## NATURE OF THE ACTION

1. This is an action to remedy and prevent further unfair competition by Defendant Swando, who, prior to joining a competitor, was the highest ranking officer of BI. Defendants have violated both the Colorado Uniform Trade Secrets Act and the federal Defend Trade Secrets Act. Swando has done so while employed by corporate Defendant Numerex. This action is also being pursued to remedy and prevent Numerex's continued interference with a contract between Swando and GEO Group.

2. Founded in 1984, Plaintiff GEO Group is a world leader in providing correction, detention, and community reentry services.

3. In 2011, GEO Group acquired Plaintiff BI. BI is a subsidiary of GEO Group.

4. BI is a technology and services company that has contracts with county, state, and federal correctional institutions to monitor individuals who are on probation, parole, work release, or serving deferred judgments.

5. BI focuses on the research, development, and sale of monitoring technology and services that enhance correctional agencies' abilities to monitor supervised individuals. BI is a leading provider of technology to community corrections and immigration partners. BI provides its technology and services to partners across the United States ("U.S.").

6. Defendant Matthew Swando is the former highest ranking officer of BI and a former employee and independent consultant of GEO Group. Plaintiffs promoted Swando from a regional sales position ultimately to a position in which he was responsible for running BI in its entirety.

7. As the highest ranking officer of BI, a position Swando held until late 2015, Swando had knowledge of all of BI's business operations, all of its technology, and all of its future plans, including product development that is currently underway but which has not yet been released to the market, and including plans to enter into new markets for which it has no competitors.

8. During his employment, Swando entered into multiple confidentiality, non-solicitation, and non-compete agreements with Plaintiffs. As explained more fully below, the 2015 Consulting Agreement provided that Swando, then an independent contractor, would not

use, disclose, or rely upon Plaintiffs' confidential information and trade secrets and that he would not work for a GEO Group competitor.

9. In June 2016, Swando terminated his 2015 Consulting Agreement with GEO Group to join GEO Group's competitor—Numerex. Shortly after quitting GEO Group, Swando began working for Numerex as a Vice President of Sales.

10. Defendant Numerex provides offender monitoring services and products in direct competition with GEO Group and BI.

11. In June 2016, GEO Group advised Numerex of Swando's contractual obligations to GEO Group and that Swando was in breach of his agreements. Nevertheless, Numerex continues to interfere with Swando's contractual obligations to GEO Group and BI.

12. The 2015 Consulting Agreement is governed by Florida law and it has a mandatory venue provision which provides for its enforcement in Florida. Therefore, the breach of the 2015 Consulting Agreement is being litigated in Florida. Because it is unclear whether the state of Florida has jurisdiction over Numerex, Plaintiffs bring their claims relating to the corporate Defendant and their claims against both Swando and Numerex here—where Swando resides and works for Numerex as well as where the trade secret misappropriation is threatened or has occurred.

## PARTIES, VENUE, AND JURISDICTION

13. Plaintiff GEO Group is a Florida corporation with its principal place of business in Boca Raton, Florida.

14. Plaintiff BI is a Colorado corporation with its principal place of business in Boulder, Colorado.

15. Defendant Swando is an individual. Swando resides in Colorado.

16. Defendant Numerex is a Pennsylvania corporation with its headquarters in Atlanta, Georgia.

17. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, federal-question jurisdiction, as Plaintiffs assert a claim under the federal Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, 1839 (2016), against Defendants.

18. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiffs' state-law claims as their basis is derived from a core group of operative facts that also serves as the basis for Plaintiffs' federal claim against Defendants.

19. Venue is proper in this Court under 28 U.S.C. § 1391(b) because Swando resides in Colorado and the torts, as well as statutory violations, committed by Defendants occurred in Colorado.

## FACTUAL BACKGROUND

### Defendant Swando's Employment with GEO Group

20. In 2004, BI hired Swando as a Regional Sales Manager (West Coast).

21. In 2010, BI promoted Swando to Vice President of Sales. In 2014, Swando was promoted to Divisional Vice President, the highest position within BI. As the Divisional Vice President, Swando was responsible for BI's: (i) profits and losses; (ii) customer and employee relationships; and (iii) business operations, including its plans for future products and market entries.

22. During the course of his ten-plus years of employment, Plaintiffs repeatedly promoted Swando to positions of greater trust, confidence, and responsibility.

23. After Swando's promotion to Divisional Vice President, his work performance began to suffer. In September 2015, due to certain events that will not be elaborated upon in this public filing, Swando resigned from his employment with BI.

24. On October 30 2015, Swando and GEO Group entered into a consulting agreement ("2015 Consulting Agreement") through which Swando agreed to provide consulting services to GEO Group and its subsidiaries.

25. The 2015 Consulting Agreement contains comprehensive confidentiality, non-solicitation, and non-compete obligations to GEO Group and its subsidiaries. A copy of the 2015 Consulting Agreement is attached as Exhibit 1 and incorporated by reference.

26. The 2015 Consulting Agreement contains the following confidentiality and restrictive covenants:

> 4. **RIGHTS AND DATA**
>
> Consultant agrees that all data, including drawings, designs, prints, photographs, specifications, test data tabulation, completed forms, reports, proposals, and all other information furnished by [GEO Group] to the Consultant for use in connection with the performance of this Agreement or emanating from the work called for under this Agreement (herein called 'GEO Data') shall be and remain the sole property of [GEO Group]. GEO Data that qualifies as Confidential GEO Information (as defined below) provided to Consultant shall be governed by the obligations of confidentiality in Section 5, data security and privacy best practices, and restrictions against disclosure at least as restrictive as those contained in this Section and Section 5 of this Agreement. The Consultant further agrees that all GEO Data not considered Confidential GEO Information shall be kept in confidence and not disclosed to third parties, excepting that certain data, as appropriate, may be disclosed to appropriate agencies/departments in connection with the performance of this Agreement. The Consultant agrees that GEO Data shall not be used for any other purposes or disclosed to any other parties except with the prior written consent of GEO. At the termination of this Agreement, or when Consultant's performance of Services ceases, for any reason, or at any other time at Company's request, Consultant must promptly deliver to Company any and all GEO Data and Confidential GEO Information (as defined

below) (including information embodied in intangible form, e.g., in computer memory) in Consultant's possession and all copies thereof, without retaining any copies, duplicates, extracts or portions thereof. Consultant understands that its obligation not to use or disclose GEO Data and GEO's Confidential Information survives termination of this Agreement.

## 5. CONFIDENTIALITY

"Confidential GEO Information" means any GEO Data or information provided under this Agreement by GEO to the Consultant that is commercially valuable, confidential, proprietary, or a trade secret. Confidential GEO Information, however, shall not include information that is or was, at the time of the disclosure: (a) generally known or available to the public; (b) received by Consultant from a third-party; (c) already in Consultant's possession prior to the date of receipt from Discloser; or (d) independently developed by Consultant. These exceptions apply in each case as long as the information was not delivered to or obtained by Consultant as a result of any breach of this Agreement, law, or any contractual, ethical, or fiduciary obligation owed to [GEO Group].

Consultant agrees (i) not to disclose Confidential GEO Information to any other person, firm, or entity without first obtaining GEO's express written consent, and (ii) that at all times it shall use the same standard of care to protect Confidential GEO Information as it uses to protect its own confidential information of a similar nature, but not less than a commercially reasonable standard of care. Consultant shall hold all Confidential GEO Information and all GEO Data in trust and confidence for GEO, and shall not use any GEO Data other than for the benefit of GEO. If Consultant becomes subject to a court order for the release of Confidential GEO Information and, or, GEO Data, or is otherwise legally compelled to release any information related to GEO, Consultant shall use its best efforts to provide GEO with as much advance notice as possible of the information's prospective release, to the extent permitted by applicable Laws, to enable GEO to petition for protective concealment, or to oppose the disclosure, of the GEO Data and, or, Confidential GEO Information. Consultant further agrees that the unauthorized disclosure of Confidential GEO Information is a material breach of this Agreement that may result in irreparable harm to GEO. In those cases, payment of monetary damages is inadequate and difficult to ascertain. Consultant agrees, therefore, that GEO may, at its sole option, seek immediate injunctive relief in any court of competent jurisdiction enjoining any further such breach, and Consultant consents to the entry of judgment for injunctive relief.

7. **RESTRICTIVE COVENANTS**

The Company and Consultant also mutually recognize that, as a result of Consultant's services to the Company, Consultant is in a position to obtain confidential information including but not limited to current and potential customer lists, staffing and staffing cost information, computer applications, data, inventions, methods, techniques, software, databases, existing and future products and services, business plans and development strategies, and other materials that the Company has spent a great deal of time and money to develop, which are essential to the activities of the Company. The parties hereto agree that the type of services which the Consultant performed for the Company is not necessarily limited to any one geographic area and, consequently, a covenant restrict competition which is limited by geographic boundaries would be meaningless and unreasonable. Consultant, therefore, agrees that during the term of this Agreement and for a period of two (2) years after this Agreement has ended for any reason whatsoever:

(a) *Competitors*. The Consultant will not directly or indirectly, alone or as a member of a partnership, or as an officer, director, stockholder or employee of any corporation, or by or through or as a part of any other entity, tender or perform any service for a competitor of Company or as party of any company in the corrections or detention industry which is the same or similar to those services which he performed for the Company, or otherwise engage in any business or other activity that is competitive with the business conducted by the Company in any state in which it regularly conducts business.

(b) *Customers*. The Consultant will not solicit or assist in the solicitation, nor will Consultant accept business from, or provide any products or services to the Company's customers with respect to any product or service provided or offered by the Company. For purposes of this provision, "customers" means any entity to which the Company sold or made an offer to sell its products or services during the two-year period prior to the expiration of this Agreement and in which the Consultant participated or otherwise was materially involved in the sale, provision, or offer to sell such products or services.

(c) *Employees*. The Consultant will not directly or indirectly, on behalf of Consultant or another, solicit, lure or hire any employee or service personnel of Company of whom Consultant became aware while providing services to the Company or encourage or induce any such persons to terminate their relationship with Company or assist or aid another in any such activity.

(d) *Clients*. The Consultant will not directly or indirectly, alone or as a member of a partnership, or as an officer, director, stockholder or employee of any corporation or by or through or as a part of any other entity, tender or perform any service for clients or prospective clients of the Company, including but not limited to governmental entities, with which the Consultant dealt or about which the Consultant received information any

time during the past twenty-four (24) month period immediately preceding the expiration of this Agreement.

The parties agree and acknowledge that the restrictions contained in this Section 7 are reasonable in scope and duration and are necessary to protect the Company's legitimate business interests as well as those of its subsidiaries or affiliates. If any covenant or agreement contained in this Section 7 is found by a court having jurisdiction to be unreasonable in duration, geographical scope or character of restriction, the covenant or agreement will not be rendered unenforceable thereby but rather the duration, geographical scope or character of restriction of such covenant or agreement will be reduced or modified with retroactive effect to make such covenant or agreement reasonable, and such covenant or agreement will be enforced as so modified.

The Consultant agrees and acknowledges that the breach of this Section 7 will cause irreparable injury to the Company or any of its subsidiaries or affiliates and upon the breach of any provision of this Section 7, the Company, its parent or any of its subsidiaries or affiliates shall be entitled to injunctive relief, specific performance or other equitable relief, without being required to post a bond; *provided*, *however*, that, this shall in no way limit any other remedies which the Company or any of its subsidiaries or affiliates may have (including, without limitation, the right to seek monetary damages).

(*See* Exhibit 1, 2015 Consulting Agreement at pp. 2-5 (emphasis in original).)

27. As a consultant, Swando reported directly to certain senior executives at GEO Group and received directions from BI's Divisional Vice President. As a consultant, Swando was responsible for the following: (1) assisting in identifying new contracted detention, correctional, residential re-entry, transportation, electronic monitoring and youth services for GEO Group and BI; (2) assisting in promoting new and/or current contracted detention, correctional, residential re-entry, electronic monitoring, transportation and youth services for GEO Group and BI; (3) travelling domestically and internationally in connection with assisting GEO Group and BI with new and/or current contracted detention, correctional, residential re-entry, electronic monitoring, transportation and youth services for GEO Group and BI; (4) facilitating, and upon request, attending meetings between GEO Group and GEO Group staff

(including its subsidiary, BI), to discuss the design, financing, marketing, bid, proposal, negotiation, construction and/or operation of current or newly identified projects; (5) promoting the positive contributions of contracted detention, correctional, residential re-entry, community supervision, electronic monitoring, transportation and youth services by GEO Group and BI; (6) assisting GEO Group and BI in obtaining contract extensions and per diem increases; and (7) providing any and all other related assistance requested by GEO Group and BI, including assisting in submitting proposals for new projects.

28. During Swando's last year of employment at GEO Group, BI's market share for radio frequency, global position system ("GPS"), and alcohol monitoring was approximately 38% while that of a subsidiary of Numerex was approximately 5%.

**Swando Terminates His 2015 Consulting Agreement And Joins A Competitor Where He Has Used Plaintiffs' Trade Secrets**

29. In approximately June 2016, Swando called Ann Schlarb ("Schlarb") (a senior executive of GEO Group) to inform her that he may have an employment opportunity with Numerex. However, in doing so, he misled her by failing to disclose the true and full nature of this employment opportunity. Swando informed Schlarb that if he were to accept employment with Numerex, he expected to be involved in "personal tracking," e.g., tracking of pets, individuals with Alzheimer's disease, and lost children. Within weeks after this phone call, Swando terminated his 2015 Consulting Agreement. Despite Plaintiffs' inquiry, Swando did not disclose for whom he would be working or the type of work in which he would be engaged.

30. In late June 2016, GEO Group learned that Swando had accepted a position as Vice President of Sales with Numerex.

31. In late June 2016, GEO Group advised Numerex that Swando had contractual obligations to GEO Group. GEO Group advised Numerex of Swando's restrictive covenants contained in the 2015 Consulting Agreement. GEO Group advised Numerex to take measures to ensure Swando's observance of his contractual obligations to GEO Group.

32. In late June 2016, GEO Group also reminded Swando of his contractual obligations to GEO Group under the 2015 Consulting Agreement. GEO Group requested that Swando provide prompt and unequivocal assurances that he would honor his restrictive covenants and otherwise adhere to his contractual obligations to GEO Group. To date, Swando has failed to provide GEO Group with the assurances it requested.

33. In August 2016, GEO Group and BI employees attended an American Probation and Parole Association ("APPA") conference in Cleveland, Ohio. This conference is directed to those engaged in the community corrections marketplace, such as GEO Group and BI. GEO Group and BI employees observed Swando working at a Numerex booth at the APPA conference. Numerex and Swando were promoting products and services in direct competition with GEO Group and BI, and which did not relate to the tracking of pets, individuals with Alzheimer's disease, or lost children. In fact, a review of Numerex's website suggests that Numerex does not provide tracking services related specifically to pets, individuals with Alzheimer's disease, or lost children.

**Defendants Are Misappropriating and Threatening To Misappropriate Plaintiffs' Trade Secret Information**

34. Plaintiffs' unique product features and services, described below, lead to their success in the marketplace. To this end, Plaintiffs maintain strict confidentiality agreements with

their employees and use password-enabled devices to secure their research and development of product features and services. To remain competitive, Plaintiffs engage in extensive research and development regarding enhanced or new products and services as well as potential market entry points for their existing products and services. This research and development allows Plaintiffs to differentiate themselves from their competitors. Plaintiffs' competitive advantage derives from their research and development of their confidential products and services.

35. Defendants compete in the same market as Plaintiffs. By using Swando's years of experience and knowledge gained at GEO Group and BI, Numerex is able to bypass the learning curves which Plaintiffs overcame. Swando is unable to unlearn the knowledge he gained while employed by Plaintiffs or the knowledge he has regarding Plaintiffs' future product and service plans. Defendants are involved in the sales of products and services similar to those sold by Plaintiffs. Swando has trade secret information related to Plaintiffs' products and services. Therefore, Defendants are, at a minimum, threatening to misappropriate Plaintiffs' trade secrets.

***Intensive Supervision and Appearance Program***

36. A contract exists between BI and the United States of America's Immigrations and Customs Enforcement ("ICE") Department, which is part of the Department of Homeland Security ("DHS"). The contract is for the administration of a program known as the Intensive Supervision and Appearance Program ("ISAP"). BI developed its business model for operating this program, which exists for the purpose of supervising, monitoring, and providing case management services for individuals who are unlawfully in the U.S. and who are being evaluated for extradition or for approval to remain in the U.S. for such things as asylum protection.

37. ISAP was first implemented in 2004 and has gone through three bidding opportunities. While BI's competitors have submitted bids in response to the federal government's request for proposals to administer ISAP, BI is the only entity to administer ISAP to date. The current ISAP contract was entered into in 2014 and expires in 2019. None of BI's competitors know the business plans underlying its administration of ISAP or how BI has organized the business to operate ISAP profitably. Therefore, a typical competitor would have to start from scratch to set up a competing business. However, Swando knows exactly how the business is organized, how it has been improved over the years through trial, error, analysis, and revision. Therefore, Swando has an advantage in competing with BI that is not based on industry knowledge and experience but, instead, is based on BI's trade secrets concerning how to organize the business profitably, including how to avoid the mistakes that BI has learned by trial and error and by analysis since the program was established in 2004.

38. BI now monitors approximately tens of thousands of illegal entrants into the U.S. through more than fifty offices while their status is being reviewed by the U.S. Executive Office of Immigration Review ("EOIR").

39. Swando, as the highest executive officer in BI, was entrusted with knowing all aspects of ISAP and improving upon its business design and operations. This business operations knowledge was not accumulated, and has never been accumulated, in a single-written document, but instead has been developed over many years at great expense to Plaintiffs. No individual outside of Plaintiffs has access to this business operations knowledge.

40. While a limited number of individuals within GEO Group and BI have knowledge of aspects of ISAP's business operations, no individual has the same level of knowledge as

Swando, other than senior executives at BI and senior executives at GEO Group. By way of example, Swando has knowledge regarding (i) the technology associated with implementing ISAP; (ii) the case-management model upon which ISAP is structured; (iii) the appropriate staffing levels based upon BI's internal efficiency reviews; (iv) the model used for pricing the ISAP contract; and (v) BI's profitability targets related to ISAP.

41. Since 2004, BI has invested considerable monetary amounts and numerous years in developing and implementing ISAP. Market research indicates it would take BI's competitors approximately one to two years to acquire and duplicate the information BI has on its implementation of ISAP. To maintain the secrecy of its ISAP program, BI requires all employees who are involved in the program to sign confidentiality agreements and use password protected computers.

42. The ISAP contract currently generates millions of dollars per year in revenue for BI.

***Data Analytics***

43. Plaintiffs have a software package called "Total Access." Total Access, in part, analyzes supervised individuals' locations through global positioning services ("GPS"). Data Analytics is a subsection of Total Access. Data Analytics analyzes whether an individual is in compliance with the supervised release program applicable to the individual.

44. Data Analytics was released in early 2016. Phase 1 has been publically released. Plaintiffs anticipate releasing Phase 2 in October 2016, but the enhancements that will be included in the Phase 2 release are not yet public. This means that none of Plaintiffs' competitors, other than Swando, are able to react to those changes yet, and they will not be able

to do so until the enhancements are made public. Swando, on the other hand, knows what those enhancements are, and he can start preparing for them now.

45. Plaintiffs anticipate releasing Phase 3 of its Data Analytics platform in 2017. Phase 3 will incorporate a significant number of currently nonpublic enhancements as well. Even Plaintiffs' sales force will not know about new design features in Data Analytics until the features are ready for release to the market. Like the Phase 2 enhancements, none of Plaintiffs' competitors, other than Swando, are able to react to those changes yet, and they will not be able to do so until the enhancements are made public. Swando, on the other hand, knows what those enhancements are, and he can start preparing for them now.

46. Defendant Numerex advertises itself as a provider of data analytics for its offender monitoring services. Therefore, Swando's knowledge of the nonpublic future enhancements of Plaintiffs' product is of particular value to Numerex in competing unfairly with Swando against Plaintiffs.

47. Software programing and design features of Data Analytics are limited to a handful of individuals, one of whom was Swando. All BI employees who work with Data Analytics sign a non-disclosure and non-compete agreement which are typically six months in length.

48. To date, BI has spent in excess of a million dollars developing Data Analytics.

***SmartLINK App***

49. In June 2015, BI acquired SoberLink. Subsequent to the acquisition of SoberLink, BI formed the Huntington Development Corporation ("HDC"). HDC exists as a technology incubator for product designs which Plaintiffs will then use. Swando was a Board Member of

HDC. As such he had access to all of its technology and innovations and oversaw its corporate strategy.

50. From June 2015 to the present, Plaintiffs have spent hundreds of thousands of dollars designing a smart phone app called SmartLINK that integrates with Plaintiffs' Total Access software. SmartLINK's function is to be a less restrictive method (than, for example, an ankle bracelet) of monitoring individuals who are subject to government supervision ("Supervised Individual"). On a monthly basis, Plaintiffs invest approximately $100,000 in HDC; a portion of which is dedicated solely to maintaining and updating SmartLINK's functionality.

51. The SmartLINK app allows a corrective agency officer to remotely program a Supervised Individual's smart phone. The app has four features: (a) check-in (which includes biometric identification and location identification functionalities); (b) calendaring (which can be linked to check-in requests; (c) status check (which poses questions to a Supervised Individual to determine if he/she is in compliance with supervision requirements); and (d) information for Supervised Individuals (which enables Supervised Individuals to obtain information to maintain compliance with their supervised conditions).

52. In approximately May 2016, Plaintiffs implemented the SmartLINK app.

53. Swando has knowledge regarding the SmartLINK app, Plaintiffs' current use of it, and, critically, Plaintiffs' intended use of it. Plaintiffs intend to use the app in new markets for which they will have no competitors as well as integrate features under development but not yet released to the marketplace.

54. Thus, while Plaintiffs have invested considerable resources concerning markets to enter into and markets not to enter into, Plaintiffs' competitors do not know which markets those are. However, Swando is in a position to compete unfairly by competing for those markets before Plaintiffs enter them.

55. By way of example, none of Plaintiffs' competitors have used the concept of applying tracking technology to track people on parole to different markets, like ISAP described above. Nor have they, to Plaintiffs' knowledge, operationalized the concept to develop other markets.

56. Information regarding future design features and market-entry points for the SmartLINK app is limited to senior BI and GEO Group employees as well as a handful of their software developers.

***BI Agency Assist Program***

57. In 2014, BI acquired Protocol Government Solutions ("Protocol"). The BI Agency Assist program leverages Protocol to provide correctional agency "assists."

58. The BI Agency Assist is a set of five administrative, technical, and data management support services as well as a 24x7 support center. The BI Agency Assist program provides (1) automated self-reporting services; (2) contact documentation services; (3) scheduling and enhanced monitoring services; (4) warrant processing services; and (5) fee processing services.

59. The automated self-reporting service saves correctional agencies time by streamlining supervised individuals' check-ins through interactive voice response ("IVR") technology. The system verifies information for each caller through a series of questions.

60. The contact documentation services is a data-entry service for officers to record case notes while in the field through BI's support specialists.

61. The scheduling and enhanced monitoring services enable officer assistance for scheduling, tracking, and verifying supervised individuals.

62. The warrant processing service expands agencies' after-hour coverage to allow them to swiftly respond to parole and probation violations. The BI Agency Assist program support center processes warrants for supervised individuals' arrest.

63. The fee processing services manages supervised individuals' fee collection and processing.

64. The BI Agency Assist program uses Plaintiffs' proprietary software which is uniquely integrated into correctional agencies' platforms.

65. At this time, BI has no competitors offering similar services to the BI Agency Assist program.

66. Swando was involved in BI's purchase of Protocol, so he has knowledge regarding the business model and Plaintiffs' future plans for the BI Agency Assist program as a result of its purchase. Swando has met with Protocol's customers and he was involved in consent meetings with Protocol's customers related to the purchase by BI. He also has knowledge regarding Plaintiffs' ability to customize the case management software to its correctional agency customers to ensure that each customer receives a software package customized to its own policies and procedures.

67. Currently, the case management software is developed by an outside entity that has a non-disclosure agreement with BI. The case management software is integrated with Plaintiffs' Total Access program.

68. Plaintiffs spend approximately $350,000 per year to maintain and make changes to the BI Agency Assist program's web-based application.

69. Approximately six individuals at BI have full knowledge regarding BI Agency Assist. Access to the BI Agency Assist program is limited by computer password protection and confidential disclaimers on e-mails.

***BI Loc8***

70. Beginning in approximately 2012, BI started developing the Loc8 ("Loc8") offender monitoring system. Loc8 operates as an advanced GPS tracking system, the components of which are its hardware, firmware, software, communications capabilities, user interface, and reporting capabilities.

71. Since 2012, BI has spent several million dollars in research and development of Loc8.

72. Loc8 features unique technologies in a tracking device. Such technologies include its (1) removable and rapid rechargeable battery; (2) tamper-detection technologies; (3) location technologies; (4) functional design; and (5) monitoring software.

73. Plaintiffs continue to invest time and money to enhance Loc8's monitoring capabilities. None of these proposed enhancements are public. This means that none of Plaintiffs' competitors, other than Swando, are able to react to those changes yet, and they will

not be able to do so until the enhancements are made public. Swando, on the other hand, knows what those enhancements are, and he can start preparing for them now.

74. Defendant Numerex advertises itself as a provider of offender monitoring products. Therefore, Swando's knowledge of the nonpublic future enhancements of Plaintiffs' Loc8 product is of particular value to Numerex in competing unfairly with Swando against Plaintiffs.

75. Future software programing and design features of Loc8 are limited to a handful of individuals, one of whom was Swando. All BI employees who work with Loc8 sign a non-disclosure and non-compete agreement which are typically six months in length.

## FIRST CLAIM FOR RELIEF
## Misappropriation of Trade Secrets under the Federal Defend Trade Secrets Act of 2016 (against all Defendants)

76. Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 75 above.

77. Plaintiffs are the owners of certain trade secrets and confidential business information relating to its products and business strategies. This information constitutes trade secrets within the meaning of Section 1839(3) of United States Code Title 18.

78. Any of these pieces of information in the hands of a competitor would seriously undermine Plaintiffs' ability to compete in the marketplace for supervised individual monitoring services, and allow a competitor the knowledge of both current and future products as well as respective strategies.

79. Plaintiffs have gone to great effort and expense to develop and maintain such trade secrets and confidential information. This expense includes millions of dollars in research

and development costs related solely to the development, maintenance, and growth of Plaintiffs' products. This information is maintained on a need to know basis.

80. Swando understood that certain trade secrets and confidential information belonging to Plaintiffs would be made available to him to enable him to perform his responsibilities as the former Divisional Vice President of BI and as a consultant to GEO Group. Swando further understood his obligation to maintain the confidentiality of those trade secrets and other confidential information, and that Plaintiffs had a legitimate business interest in keeping that information confidential.

81. Plaintiffs took reasonable and considerable efforts to maintain the confidentiality and secrecy of their trade secrets and confidential business information as encompassed in their multifaceted technology-based security strategy and through their requirement that all individuals coming into knowledge of their trade secrets sign strict confidentiality agreements.

82. No one outside of Plaintiffs knows, or has access to, Plaintiffs' product designs and strategic plans, and other trade secrets. Plaintiffs' trade secrets give Plaintiffs a unique competitive advantage in a fairly closed marketplace with a high cost of entry.

83. Swando is in possession of Plaintiffs' trade secrets, which were only made available to him under circumstances requiring that he maintain their secrecy.

84. The trade secret information misappropriated by Defendants has actual or potential independent economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use, including through limiting access to a small group of critical employees on a "need-to-know" basis, and requiring Swando to sign the 2015 Consulting Agreement referenced above.

85. As demonstrated by the conduct described above, Defendants have misappropriated or threatened to misappropriate, and will continue to misappropriate or threaten to misappropriate (if not restrained), Plaintiffs' trade secrets and confidential business information for the purpose of using and exploiting them for Defendants' interests, without license or permission from Plaintiffs.

86. Swando's threatened or actual misappropriation of Plaintiffs' trade secrets is attended by circumstances of fraud, malice, or willful and wanton disregard of Plaintiffs' rights.

87. Defendants' threatened or actual misappropriation of Plaintiffs' confidential and proprietary trade secrets has caused and will continue to cause Plaintiffs irreparable injury and damages unless Defendants are permanently enjoined by the Court, and Plaintiffs have no adequate remedy at law.

88. Defendants threatened or actual misappropriation of Plaintiffs' confidential and trade secret information constitutes a breach of the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836 and 1839, entitling Plaintiffs to relief.

89. Plaintiffs are entitled to preliminary and permanent injunctive relief enjoining Defendants from continuing to misappropriate or to threaten to misappropriate Plaintiffs' trade secrets.

## SECOND CLAIM FOR RELIEF

**Misappropriation of Trade Secrets under the Colorado Uniform Trade Secrets Act (against all Defendants)**

90. Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 75 above.

91. Plaintiffs are the owners of certain trade secrets and confidential business information relating to their products and business strategies. This information constitutes trade secrets within the meaning of Section 7-24-102(4) of the Colorado Revised Statutes.

92. Any of these pieces of information in the hands of a competitor would seriously undermine Plaintiffs' ability to compete in the marketplace for supervised individual monitoring services, and allow a competitor the knowledge of both current and future products as well as respective strategies.

93. Plaintiffs have gone to great effort and expense to develop and maintain such trade secrets and confidential information. This expense includes millions of dollars in research and development costs related solely to the development, maintenance, and growth of Plaintiffs' products. This information is maintained on a need to know basis.

94. Swando understood that certain trade secrets and confidential information belonging to Plaintiffs would be made available to him to enable him to perform his responsibilities as the former Divisional Vice President of BI and as a consultant to GEO Group. Swando further understood his obligation to maintain the confidentiality of those trade secrets and other confidential information, and that Plaintiffs had a legitimate business interest in keeping that information confidential.

95. Plaintiffs took reasonable and considerable efforts to maintain the confidentiality and secrecy of their trade secrets and confidential business information as encompassed in their multifaceted technology-based security strategy and through their requirement that all individuals coming into knowledge of their trade secrets sign strict confidentiality agreements.

96. No one outside of Plaintiffs knows, or has access to, Plaintiffs' product designs and strategic plans, and other trade secrets. Plaintiffs' trade secrets give Plaintiffs a unique competitive advantage in a fairly closed marketplace with a high cost of entry.

97. Swando is in possession of Plaintiffs' trade secrets, which were only made available to him under circumstances requiring that he maintain their secrecy.

98. The trade secret information misappropriated by Defendants has actual or potential independent economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use, including through limiting access to a small group of critical employees on a "need-to-know" basis, and requiring Swando to sign the 2015 Consulting Agreement referenced above.

99. As demonstrated by the conduct described above, Defendants have misappropriated or threatened to misappropriate, and will continue to misappropriate or threaten to misappropriate (if not restrained), Plaintiffs' trade secrets and confidential information for the purpose of using and exploiting them for Defendants' interests, without license or permission from Plaintiffs.

100. Swando's misappropriation of Plaintiffs' trade secrets is attended by circumstances of fraud, malice, or willful and wanton disregard of Plaintiffs' rights.

101. Defendants' misappropriation of Plaintiffs' confidential and proprietary trade secrets has caused and will continue to cause Plaintiffs' irreparable injury and damages unless Defendants are permanently enjoined by the Court, and Plaintiffs have no adequate remedy at law.

102. Defendants' misappropriation of Plaintiffs' confidential and trade secret information constitutes a serious breach of the Colorado Uniform Trade Secrets Act, Colo. Rev. Stat. §§ 7-74-101 *et seq.*, entitling Plaintiffs to relief.

103. Plaintiffs are entitled to preliminary and permanent injunctive relief enjoining Defendants from continuing to misappropriate or to threaten to misappropriate Plaintiffs' trade secrets.

**THIRD CLAIM FOR RELIEF**
**Intentional Interference With Non-Compete Agreement**
**(against Numerex)**

104. Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 75 above.

105. GEO Group's contractual agreement with Swando provides that for a period of two years after the 2015 Consulting Agreement ends, he "will not directly or indirectly, alone or as a member of a partnership, or as an officer, director, stockholder or employee of any corporation, or by or through or as a party of any other entity, tender or perform any service for a competitor of [GEO Group] or as part of any company in the corrections or detention industry which is the same or similar to those services which he performed for [GEO Group], or otherwise engage in any business or other activity that is competitive with the business conducted by [GEO Group] in any state in which it regularly conducts business." (Ex. 1 at 4.)

106. Numerex had knowledge of this contractual obligation through a letter of notice provided to it. Numerex responded to this letter of notice and stated it did not believe its actions violated the 2015 Consulting Agreement.

107. Numerex competes with Plaintiffs in the correctional and detention industry.

108. Upon information and belief, Swando is performing similar duties for Numerex to that which he performed for GEO Group.

109. Despite knowledge of GEO Group's contractual and advantageous business relationship with Swando, Numerex has intentionally and tortiously interfered with GEO Group's contractual and advantageous business relationship with Swando by inducing, conspiring with, and encouraging Swando to breach and/or continue to breach his 2015 Consulting Agreement.

110. As a direct and proximate result of Numerex's intentional and tortious interference in GEO Group's contractual and advantageous business relationship with Swando, GEO Group has suffered and will continue to suffer irreparable harm and other injury and damages, including but not limited to lost investment, lost profits, damage to its relationship with its customers, employee relations, business reputation, and goodwill, and for some injuries in which there is no adequate remedy at law.

111. GEO Group is entitled to monetary and special damages as a result of Numerex's interference with GEO Group's 2015 Consulting Agreement with Swando.

**FOURTH CLAIM FOR RELIEF**
**Intentional Interference With Confidentiality Agreement**
**(against Numerex)**

112. Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 75 above.

113. GEO Group's contractual agreement with Swando provides that for a period of two years after the 2015 Consulting Agreement ends, he "agrees (i) not to disclose Confidential

GEO Information to any other person, firm, or entity without first obtaining GEO's express written consent." (Ex. 1 at 3.)

114. Numerex had knowledge of this contractual obligation through a letter of notice provided to it. Numerex responded to this letter of notice and stated that it did not believe that its actions violated the 2015 Consulting Agreement.

115. At no time has GEO Group provided its consent to Swando to disclose GEO Group information.

116. Upon information and belief, Swando has provided confidential GEO Group information to Numerex.

117. Despite knowledge of GEO Group's contractual and advantageous business relationship with Swando, Numerex has intentionally and tortiously interfered with GEO Group's contractual and advantageous business relationship with Swando by inducing, conspiring with, and encouraging Swando to breach and/or continue to breach his 2015 Consulting Agreement.

118. As a direct and proximate result of Numerex's intentional and tortious interference in GEO Group's contractual and advantageous business relationship with Swando, GEO Group has suffered and will continue to suffer irreparable harm and other injury and damages, including but not limited to lost investment, lost profits, damage to its relationship with its customers, employee relations, business reputation, and goodwill, and for some injuries in which there is no adequate remedy at law.

119. GEO Group is entitled to monetary and special damages as a result of Numerex's interference with GEO Group's 2015 Consulting Agreement with Swando.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A. That the Court enter a preliminary and permanent injunction prohibiting Defendants from continuing to misappropriate, or threatening to misappropriate, Plaintiffs' trade secrets;

B. That the Court enter a preliminary and permanent injunction prohibiting Defendant Numerex from interfering with GEO Group's 2015 Consulting Agreement with Swando;

C. That the Court award Plaintiffs compensatory and other monetary damages against Defendants, including lost profits and interest, in an amount to be proven at trial, including (without limitation) the cost of litigation against Swando made necessary by Defendants' wrongful acts;

D. That the Court award Plaintiffs their attorneys' fees and costs; and

E. That the Court award Plaintiffs such other relief as the Court deems appropriate.

Dated: September 19, 2016

*s/Darren E. Nadel*
Darren E. Nadel
Michelle L. Gomez
Andrew B. Epstein
Littler Mendelson, P.C.
1900 16th Street, Suite 800
Denver, CO 80202
Telephone: 303.629.6200
Facsimile: 303.629.0200
dnadel@littler.com
mgomez@littler.com
aepstein@littler.com

**ATTORNEYS FOR PLAINTIFFS**

Firmwide:142812490.5 059218.1282